UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Seth Bader

        v.                              Civil No. 11-cv-043-SM

William Wrenn, Commissioner,
New Hampshire Department of
Corrections

## REPORT AND RECOMMENDATION

Seth Bader, currently incarcerated by the New Hampshire Department of Corrections ("DOC"), has filed a request for preliminary injunctive relief (doc. no. 2).  Bader seeks a transfer to the New Hampshire State Prison for Men at Concord ("NHSP") from his current housing assignment at the Northern New Hampshire Correctional Facility ("NCF"), in order that he may participate in Jewish religious activities held at the NHSP.

Chief Judge McAuliffe referred the preliminary injunction motion to this Magistrate Judge for consideration, proposed findings, and a recommendation (doc. no. 4).  A hearing was held in this matter on February 18, 2011.

## Background

At the hearing, the Court heard testimony and accepted certain documentary evidence.  The facts presented at the hearing that are relevant to the findings and recommendation

made herein were not in dispute.  Accordingly, the Court's
recitation of the facts does not resolve any difference in the
parties' factual assertions, but instead, identifies the facts
relevant on the legal question presented.

I.    New Hampshire State Prison at Concord

     A.    Bader's Jewish Practice at NHSP

Seth Bader has been incarcerated by the DOC for more than
thirteen years.  He is serving a sentence of life without the
possibility of parole.  Bader is presently a medium security, or
"C-3" inmate and was a C-3 inmate during essentially his entire
incarceration.

Religious programming, services, and activities may be
practiced and attended by DOC inmates in accordance with DOC
Policy and Procedure Directive ("PPD") 7.17.  Def. Ex. K.
Inmates may not conduct group worship or other group religious
activities themselves, but must do so with either the prison
chaplain, or with an approved volunteer, who may be either a
clergyperson or lay person, as long as the volunteer has DOC
approval to conduct the activities.  Id.  The parties do not
dispute the contents of the DOC's policy regarding religious
programming and activities, and agree that group religious
activities may occur only if led by the prison chaplain, as

appropriate, or by an approved volunteer.  The parties also do not dispute that this policy is in effect at both NHSP and NCF.

Bader is an orthodox Jew.  He actively practices his religion in the prison to the extent he is able.  The defendant do not dispute the validity or sincerity of Bader's identification as an observant orthodox Jew.  Bader and other witnesses testified that while he was incarcerated in the NHSP he was an active participant in a number of volunteer-led Jewish religious programs and activities.

Every other week, Bader participated in a Judaism education class led by Martin Bender, a lay volunteer affiliated with a Jewish synagogue in Concord, New Hampshire.  Mr. Bender testified that either he or another lay volunteer, Ben Fish, also went to the NHSP on two Friday afternoons per month to conduct Sabbath services, which included group prayer as well as rituals associated with traditional Jewish Sabbath ceremonies. Mr. Bender testified he also participated in many Jewish holiday celebrations with Bader and other NHSP inmates.

Rabbi Levi Krinsky, from Chabad Lubavitch synagogue in Manchester, New Hampshire, testified that he goes to the NHSP approximately five times a year, generally in conjunction with important Jewish holidays.  Rabbi Krinsky conducts ceremonies, prayers, and other rituals with inmates at these events.  Among these activities, Rabbi Krinsky assists inmates in praying with

tefillin, a practice wherein a Jewish man engages in certain prayers while wearing a box containing religious texts strapped to his head and arm.  Bader testified that he cannot perform tefillin himself because he is insufficiently familiar with the prayer and proper placement of the tefillin.  Rabbi Krinsky testified that most people cannot properly place tefillin or say the relevant prayers without assistance.

Rabbi Krinsky testified that group worship is important in Judaism.  Specifically, Rabbi Krinsky stated that Jews believe that "the greater the assembly, the greater glory it is to God." Rabbi Krinsky testified that when he is meeting with an inmate in person at the prison, he feels he is able to offer more meaningful spiritual guidance and support than he could if the meeting were not face-to-face, as he is able to look the inmate in the eye and offer personal and particular solace and comfort, in addition to religious guidance.

While housed at the NHSP, Bader had access, in addition to the activities discussed above, to items and foods associated with religious holidays.  Further, rabbinical students visit the inmates at the NHSP several times a year to offer religious instruction and counseling.  Inmates also receive certain items, including food and worship items, provided by the Aleph Institute, a Florida organization that, among other things,

provides assistance to Jewish prisoners to enable them to practice their religion during their incarceration.

      B.   November 26, 2010 to December 3, 2010

On November 26, 2010, at the direction of NHSP Major John Fouts, who is the head of security for that facility, NHSP security personnel conducted a thorough search of Corrections Industries, where Bader worked in an administrative capacity. At the time of the search, Bader had worked there for approximately five years.

During the search, three inmates including Bader were found in possession of suspected contraband.  One inmate had a key to a telephone lock taped underneath his desk.  Another inmate had legal materials that indicated that the inmate was doing legal work for another inmate.

At Bader's work station, officers found classical music CDs and several floppy disks.  Although the disks contained mostly material related to Bader's job, one of those disks contained a file called "WWII" which contained pictures of antique firearms.

As a result of the search, Bader and the other two inmates found with suspected contraband were written up for disciplinary violations.  Both of the other inmates received disciplinary write-ups and lost their jobs with Corrections Industries, but remained at the NHSP facility.

Bader, however, was transferred to NCF on December 3, 2010. Bader's disciplinary charge, possessing property not issued by an appropriate authority, was also transferred to NCF.  After the NCF hearings officer investigated Bader's disciplinary write-up, he found that no rules had been violated.  The investigation determined that Bader had been given the items in question either by Corrections Industries staff, or by other inmates with the approval and permission of Corrections Industries staff.  The disciplinary charge was not brought to a hearing, but was filed without prejudice, and was ultimately dismissed.

Major Fouts testified at the hearing.  Fouts testified that he reviewed the floppy disks from Bader's workstation and could not determine the nature of all of the material on the disks. In further investigating the contents of the disks, Fouts spoke with Don Tanguay, the individual in charge of the NHSP education department.  After speaking with Tanguay, Fouts was concerned that Bader might be taking liberties in the education department, as well as in Corrections Industries, that pointed to the potential for future problems with Bader at the NHSP.

Specifically, Fouts testified that corrections officers are trained to look out for inmate behavior that might be designed to set officers up by getting an officer to bend rules, and slowly pushing the officer to exceed the bounds of appropriate

behavior.  Fouts stated this can be a problem because those rule violations by jail personnel become ammunition the inmate can use later to extort favors or other benefits from officers who have previously bent the rules.

Fouts was concerned that Bader's receipt of music CDs, possession of floppy disks containing data not directly related to work, both with staff blessing, and Bader's actions in the education department, might indicate that Bader was developing relationships with staff members at NHSP that were too comfortable.  Fouts was concerned that Bader might, in the future, attempt to exploit those relationships to his own advantage, and to the detriment of institutional security.  To fend off the potential for such harm, Fouts decided to move Bader to NCF.

II. <u>Northern New England Correctional Facility</u>

Bader was transferred to NCF on December 3, 2010.  On December 5, 2010, two days after his transfer to NCF, Bader sent a written request to Dana Hoyt, the NCF Chaplain, stating: "I would like to know if there are any Jewish chapel activities up here as there are in Concord."  Hoyt responded to Bader's request, writing: "I'm sorry to say, no.  We have no Jewish volunteers."

Rabbi Krinsky and Martin Bender both testified at the hearing that they are approved DOC volunteers.  Their volunteer status entitles them to volunteer at any DOC institution.  See Def. Ex. G.  Both Rabbi Krinsky and Mr. Bender testified, however, that NCF is too far away for them to volunteer there, and that they would not themselves be able to offer any volunteer services at NCF.

Upon Bader's transfer to NCF, Chap. Hoyt embarked on an effort to recruit volunteers to oversee Jewish religious activities at NCF.  Chap. Hoyt testified that he has found a cantor, a Jewish clergyperson who is not a rabbi, who is willing to visit Bader at NCF to help Bader conduct a Passover service and celebration in April of this year.  Chap. Hoyt further testified that the Aleph Institute has contacted him to arrange for rabbinical student visits with Bader in July.  Chap. Hoyt expressed willingness to attempt to obtain items necessary for Bader's Passover celebration through the Aleph Institute, although, he stated, Bader had not yet requested any provisions for Passover.  Def. Ex. L.  Further, Hoyt testified that he has arranged visitation for Bader with Rabbi Joshua Segal from Amherst, New Hampshire, several times during the spring and summer of 2011.  Def. Ex. L.  Chap. Hoyt stated that he continues to make efforts to find additional volunteers to provide Jewish activities for Bader at NCF.

8

NHSP Chaplain Jim Daly testified that, as with other Jewish inmates, Bader is allowed to have one religious medallion, a yarmulke, one prayer shawl, and one set of tefillin.  See Def. Ex. K. (listing personal items permitted for Jewish inmates pursuant to PPD 7.17).  Inmates are also allowed to have religious literature and can access religious audio and video recordings as available.  Def. Ex. K.

## Discussion

I.   Standard of Review

"A preliminary injunction is an extraordinary and drastic remedy."  Munaf v. Geren, 553 U.S. 674, 689 (2008).  In considering a motion for preliminary injunctive relief, a district court must consider: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest."  Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008) (quotation marks and citations omitted).  Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the underlying action.  See Jean v. Mass. State Police, 492 F.3d

24, 26-27 (1st Cir. 2007).  "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see ANSYS, Inc. v. Computational Dynamics N. Am., Ltd., 595 F.3d 75, 78 (1st Cir. 2010) (likelihood of success on the merits generally given particularly heavy weight in preliminary injunction decision (citing Waldron v. George Weston Bakeries, Inc., 570 F.3d 5, 8 (1st Cir. 2009))).

## II.  Likelihood of Success on the Merits

Bader's complaint contains only one claim, that the prison's act of transferring him to NCF, and the attendant adverse impact on his religious practice, violates the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, et seq. ("RLUIPA").  RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

To establish a claim under RLUIPA, plaintiff must demonstrate that (1) he is an institutionalized person, (2) whose religious exercise has been burdened by government action, and (3) that the burden is substantial.  See Spratt v. R.I. Dep't of Corrs., 482 F.3d 33, 38 (1st Cir. 2007).  If the plaintiff can establish those elements, the burden shifts to the government to demonstrate "that the burden furthers a compelling governmental interest and . . . that the burden is the least restrictive means of achieving that compelling interest."  Id.

In order to demonstrate likelihood of success on the merits of his RLUIPA claim, therefore, Bader must first establish that he would be able to meet his initial burden.  Bader must demonstrate that, as an institutionalized person, his religious exercise has been substantially burdened by an act or policy of the government.

A.    Undisputed Elements

1.    Institution and Institutionalized Person

Defendant does not dispute that Bader is an institutionalized person within the meaning of RLUIPA, or that the DOC is a government agency subject to the requirements of that statute.  See 42 U.S.C. § 1997(1) ("The term 'institution' means any facility or institution – (A) which is owned, operated, or managed by, or provides services on behalf of a

State; and (B) which is . . . (ii) a jail, prison or other correctional facility,  . .”).  Accordingly, the Court finds those aspects of Bader's RLUIPA claim to be established.

2.   Religious Exercise

Bader alleges that his ability to participate in Sabbath services and prayers, certain holiday celebrations, religious education, and rabbinical counseling and guidance, are religious exercises that have been burdened.  The government does not dispute that these activities are "religious exercise[s]" as defined by RLUIPA, see 42 U.S.C. § 2000cc-5(7)(A) ("'Religious Exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief"), or that Bader's religious beliefs are sincerely held.  See Cutter v. Wilkinson, 544 U.S. 709, 726 (2005) ("Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity.").  The government also concedes that Bader does not, at NCF, at this time, have access to the sort of religious activities that were available to him at the NHSP, and which remain available to Jewish inmates housed at the NHSP.

12

B.   Governmental Imposition of Substantial Burden

Bader claims that the prison's act of transferring him to NCF imposed a substantial burden on his exercise of religion, in violation of RLUIPA.  While the government does not dispute that Bader's religious exercise has been burdened, it contends that the government has not imposed that burden by effecting any act, regulation, or policy.  Instead, the government argues that the absence of available volunteers at NCF has imposed the burden.  Accordingly, defendant argues that the government cannot be said to have imposed a substantial burden on Bader's religious practice.

"Substantial burden" is not defined in RLUIPA, and the circuit courts of appeals are not in agreement on a definition of that term when used in the RLUIPA context.  See Michael DeStefano, Note, Defining Substantial Burden Under the Religious Land Use and Institutionalized Persons Act: The Third Circuit's Successful Clarification, 35 New Eng. J. on Crim. & Civ. Confinement 277, 296-305 (2009) (collecting cases and discussing split in the circuits).  The Supreme Court has declined, to date, to resolve the disagreement among the circuits.  See id. The First Circuit has not directly weighed in, but, has assumed, without deciding, that "a 'substantial burden' is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  Spratt, 482 F.3d at 38

(citing <u>Thomas v. Review Bd. of Ind. Emp't Sec. Div.</u>, 450 U.S.
707, 718 (1981)).

Bader has demonstrated that there are numerous prayers,
weekly services, and holiday celebrations that he was able to
participate in while at NHSP, that he does not now have access
to at NCF.  Bader testified that there are important religious
practices, such as Sabbath services, recitation of certain
prayers, use of the tefillin, holiday rituals, services, and
celebrations, and Judaism education, that he cannot engage in at
NCF.  To describe these burdens as insubstantial would not do
justice to the undisputed evidence in this case.  However, to
satisfy his initial burden under RLUIPA, and shift the burden of
proof in this case to the defendant, plaintiff must first show
that the substantial burden has, in fact, been imposed by a
government act, regulation or policy.  For the reasons stated
herein, the Court finds that plaintiff has not made this
showing.

"A government action or regulation does not rise to the
level of a substantial burden on religious exercise if it merely
prevents the adherent from either enjoying some benefit that is
not otherwise generally available or acting in a way that is not
otherwise generally allowed."  <u>Adkins v. Kaspar</u>, 393 F.3d 559,
570 (5th Cir. 2004).  In <u>Adkins</u>, plaintiff Adkins, a Yahwist
prisoner, asserted that his religion required group worship

during weekly Sabbath services as well as on holy days.  Id. at
562.  The correctional facility where Adkins was housed required
an outside volunteer to conduct group worship.  Id. at 563.  An
outside volunteer came to the facility once a month to lead
group worship, but due to the time and travel involved, could
not come more often to lead weekly group worship.  Id.  Adkins
claimed that the government imposed a substantial burden on his
religious exercise because the prison required a volunteer to be
present for inmates to be able to engage in group worship,
thereby denying Yahwist inmates the ability to engage in group
practice more than once a month.  Id. at 562.  Adkins asserted
that denial of weekly group worship, a requirement of his faith,
constituted a substantial burden on his religious practice
imposed by the government, and therefore that it violated
RLUIPA.  Id.

    The Adkins court found that Adkins had been, and continued
to be, "prevented from congregating with other [Yahwists] on
many Sabbath and [Yahwist] holy days."  Id. at 571.  The court
found, however, that the denial of religious services resulted
"from a dearth of qualified outside volunteers available to go
to [Adkins' correctional facility] on every one of those days,
not from some rule or regulation that directly prohibits such
gatherings."  Id.  Because the burden was imposed by the lack of
volunteers, and not by the volunteer policy or any execution of

15

that policy by government officials, the Fifth Circuit ruled that RLUIPA had not been violated.  Id.

Although the First Circuit has not itself adopted a definition of "substantial burden" for RLUIPA cases, it has relied on the Supreme Court's definition in Thomas.  See Spratt, 482 F.3d at 38.  The Adkins Court similarly followed Thomas. See Adkins, 393 F.3d at 569.  This Court finds the reasoning and discussion in Adkins regarding the appropriate definition of "substantial burden" to be persuasive, and applies it here.

DOC officials maintain and implement a policy that group religious practice may occur only if led by the Chaplain, or by an approved volunteer.  Neither party has suggested that Chap. Hoyt is an appropriate clergyperson to conduct the services Bader seeks, and the Court finds upon the record before the Court that Chap. Hoyt is not.  Further, there is no dispute that the DOC has approved several volunteers, including Rabbi Krinsky, Mr. Bender, and Mr. Fish, who have been regular volunteers at the NHSP.  All of those volunteers have been approved to visit NCF and would be permitted to do so by NCF officials if the volunteers so desired.  Rabbi Krinsky and Mr. Bender, however, are not able to travel to NCF due to its remote location.  There was no testimony at the hearing as to whether

or not Mr. Fish would ever be willing or able to travel to NCF, but, as of the date of the hearing, he had not done so.[1]

Chap. Hoyt testified that he has actively recruited individual volunteers and organizations to provide Bader with religious counseling, services, and items.  Specifically, Chap. Hoyt has found a rabbi from Amherst, New Hampshire, who is willing to visit Bader two to three times in the spring and summer, a cantor located near NCF who is available to conduct Passover services, and rabbinical students to visit twice in July.  Chap. Hoyt continues to make inquiries to find appropriate volunteers to lead Jewish services at NCF.  Chap. Hoyt also testified that he had made, and was willing to continue to make, efforts to obtain religious items and food for holiday celebrations and religious practice for Bader and other Jewish inmates at NCF.  The government in this instance, therefore, has not used the volunteer requirement to somehow deny Bader access to religious practice, but has, in fact, attempted to provide Bader with as much access to religious practices as possible at NCF within the confines of that regulation.

_____

[1] The Court notes that, while Rabbi Krinsky and Mr. Bender both stated they would not travel to NCF due to its location, there is nothing in the record, or in plaintiff's argument, to suggest that Berlin, which is a two and a half hour drive from Concord, is so remote that it is unreasonable to expect that any volunteer from the southern part of the state would ever travel there.

Bader has challenged neither the DOC policy imposing the volunteer requirement nor the application of that policy to him. Instead, Bader points only to the act of transferring him to NCF as imposing a substantial burden on his religious exercise.

In fact, Bader is subject to the same restrictions and allowed the same privileges at NCF as he was at the NHSP, i.e., to engage in certain religious practices when they are led by an approved volunteer.  The NHSP actually has volunteers to conduct these services, while NCF does not.  It is the location of NCF that has caused the dearth of volunteers, not the government's action (i.e., the transfer).  The lack of religious activities arising from the lack of volunteers, therefore, is properly considered to be "incidental" to the transfer, and not directly occasioned by the transfer.  See Lyng v. Nw. Indian Cemetary Protective Ass'n, 485 U.S. 439, 450 (1988) (rejecting notion that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious belief" would suffice to demonstrate governmental imposition of substantial burden on religious exercise under RLUIPA).

The Court now finds, in accord with the holding in Adkins, on similar facts, that despite the impact on Bader's religious practice that has occurred incidentally to his transfer to NCF,

the government has not imposed a substantial burden on Bader's religious exercise. See Adkins, 393 F.3d at 570; cf. Walls v. Schriro, No. CV 05-2259-PHX-NVW (JCG), 2008 WL 544822 (D. Ariz. Feb. 26, 2008) (no RLUIPA violation and no substantial burden on inmate's religious practice where inmate's housing unit lacked sufficient number of members of his faith group and available volunteers to allow inmate to engage in religious services, and prison declined to transfer inmates to obtain quorum where volunteers were available); James v. Price, No. 2:03-CV-0209, 2005 WL 483443 (N.D. Tex. Mar. 2, 2005) (failure to transfer plaintiff inmate to unit where volunteer-led group worship for his faith group was available did not impose substantial burden on plaintiff's religious exercise in violation of RLUIPA where absence of religious services on plaintiff's housing unit was not prohibited by prison, but was caused by a lack of available volunteers).

The group religious activities and services provided by the volunteers at the NHSP are a "benefit that is not otherwise generally available . . . or otherwise generally allowed." See Adkins, 393 F.3d at 570. The services themselves are more than what Bader is entitled to under the DOC's unchallenged volunteer policy. The government action in transferring Bader to NCF did not prevent him from receiving those services. The volunteers themselves have been unable to travel to NCF. As previously

19

stated, that failure of volunteers to appear, as long as their visits are not prohibited by an action of the government, does not give rise to a RLUIPA claim.   See id.

Accordingly, Bader has not met his burden to demonstrate that the government has imposed a substantial burden on his religious exercise.   The burden of proof in this matter does not, therefore, shift to the defendant to demonstrate that the transfer was the least restrictive means to achieve a compelling interest.   The Court need not decide whether defendant offered sufficient evidence to meet that burden, as the finding that the plaintiff has failed to meet his initial burden renders that exercise unnecessary.

III.   Proposed Findings and Recommendation

For the foregoing reasons, the Court finds that Bader cannot prove that he is likely to succeed on the merits of his underlying RLUIPA claim.   Accordingly, the Court proposes the following findings of fact and law, and recommends that the motion for a preliminary injunction (doc. no. 2) be denied:

1.   Seth Bader has been incarcerated at the DOC since 1998.   The DOC is a governmental institution receiving federal money and is therefore subject to the provisions of RLUIPA.   See 42 U.S.C. § 2000cc-1(b)(2).

2.    Until December 3, 2010, Bader was continuously housed at the NHSP.  Since December 3, 2010, Bader has been housed at NCF.  Bader is, and has been since shortly after entering the DOC, a medium security C-3 inmate.

3.    The DOC policy regarding religious services, which is not challenged here, is codified at PPD 7.17, and requires that all group religious activities occur under the oversight of a Chaplain or approved volunteer.

4.    Bader is a practicing orthodox Jew.  His religious beliefs are sincerely held.  Bader has engaged in religious exercises and practices at the NHSP since he arrived there in 1998.  Prior to December 3, 2010, Bader regularly participated in:

  a.    holiday celebrations five or more times a year, including, among other things, celebrations of Passover, Rosh Hashanah, Yom Kippur, Purim, Sukkot, and Chanukah;

  b.    Shabbat services twice a month;

  c.    religious educational classes with lay volunteers every other week;

  d.    a no-pork diet; and

  e.    prayer with the use of tefillin on the occasions Rabbi Krinsky visited the NHSP.

5.    On December 3, 2010, Bader was transferred to NCF from the NHSP by DOC officials, due to a suspicion that Bader was

developing a relationship that was too comfortable with certain staff members at the NHSP that might present problems to institutional security in the future if left unchecked.

6.   At NCF, no Jewish volunteers have visited Bader to provide religious services.  The volunteers who come to the NHSP have been approved to come to NCF but are not willing to travel to NCF due to its distance from their homes.

7.   Chaplain Hoyt at NCF is not an appropriate clergyperson for conducting the Jewish religious practices at issue.

8.   Bader has not been able to participate in any group worship since arriving at NCF on December 3, 2010.  The lack of group worship, prayer, celebration, and ceremonies prevents Bader from practicing his religion as he had at the NHSP, and, to some extent, as he feels his religion requires.

9.   Chap. Hoyt at NCF has arranged for a number of volunteers to visit Bader at NCF, including a rabbi, a cantor, and rabbinical students during the spring and summer of 2011. Chap. Hoyt is willing to continue to locate volunteers and to obtain religious items from the Aleph Institute to the extent they are available and are consistent with DOC policy.

10.  No one at the DOC has taken any action with the intent to restrict Bader's religious practice.

11.   Bader's transfer to NCF was motivated by security concerns, and not by any effort to separate Bader from any religious exercise.

12.   While the location of NCF has contributed to the dearth of volunteers available to perform religious services Bader could attend, it is the lack of volunteers, and not the transfer itself, that caused the substantial burden to Bader's religious practice.

13.   Because the government did not impose the substantial burden on Bader's religious practice, defendant has not violated RLUIPA, and is therefore not required to reverse Bader's transfer.

14.   Bader has not demonstrated a likelihood of success on the merits of his RLUIPA claim.

## Conclusion

Any objections to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d

554, 564 (1st Cir. 2010); <u>United States v. Lugo Guerrero</u>, 524
F.3d 5, 14 (1st Cir. 2008).

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  March 14, 2011

cc:  Michael Sheehan, Esq.
     Danielle Pacik, Esq.

LBM:jba